## BOARD OF ED, CITY OF SHAWNEE v. AMERICAN NATIONAL CO.

No. 17393. Opinion Filed April 17, 1928.

Rehearing Denied March 12, 1929.

Arrington & Evans, Waldrep & Jones, and F. H. Reilly, for plaintiff in error.

Park Wyatt and Wilbur J. Holleman, for defendant in error.

RILEY, J. The defendant in error, American National Company, brought this action against the board of education to recover a sum certain purporting to be due as interest on coupons on certain bonds purporting to have been issued by the school district comprised of the city of Shawnee and territory annexed thereto for school purposes.

The action involves directly the interest coupons accrued on $100,000 worth of bonds. The plaintiff alleged that it was the owner and holder in due course of the coupons and that payment thereon had been refused. The defendant denied that plaintiff was the owner or holder in due course of the bonds or coupons and pleaded knowledge on the part of plaintiff, and pleaded a conspiracy between the plaintiff and the National Bank of Commerce to illegally and unlawfully secure said bonds; and pleaded further, a void transaction in failure to pay par for the bonds. The plaintiff replied, alleging it purchased the bonds from and paid to the National Bank of Commerce a reasonable market value for said bonds, and that it had no agreement, contract, or understanding with defendant school board concerning the bonds; otherwise denying.

The facts disclosed by the record are:

Ninety thousand dollars worth of the bonds in question were authorized by a vote of the people of the school district and dated May 21, 1917, and $10,000 worth of the bonds were authorized by the same municipal subdivision in 1920. The 1917 bonds were purchased in 1917, by the then treasurer of the school district, Mr. Keller, and indorsed by him in red ink on the face of the bonds, "Purchased with Sinking Fund, School District No. 93." The sinking fund used in this purchase was not that fund levied and collected to pay this particular bond issue, but funds derived to pay a previous issue.

C. C. Roberts, the vice president of the plaintiff American National Company, negotiated the transaction for plaintiff in securing the bonds in controversy. He testified that he knew the bonds represented by the coupons had been purchased and held by the school district's sinking fund investment therein, prior to his company's purchase of the same and at the time of purchase.

C. E. Manny, assistant cashier of the National Bank of Commerce, testified that the bonds in question were sold by his bank to plaintiff for 98½c on the dollar par value; that his bank handled the sale of the bonds to plaintiff. That the bonds were never assets of his bank and his bank never purchased them. That he delivered the bonds to plaintiff in Oklahoma City on March 9, 1924, and received a telegram from plaintiff on March 11, 1924, saying the money had been placed to his bank's credit for the benefit of the school district of Shawnee, and that he thereupon, and on March 11th, placed to the credit of the defendant school district in his bank the amount secured at 98½c plus $1,500, a sufficient amount to bring the credit to par; that the additional amount was made up by his bank.

It appears that Wallace Estill, president of the National Bank of Commerce, and Mr. Manny, assistant cashier of the bank, wherein the school funds were deposited, went before the school board and informed the board that there were not sufficient funds on deposit to carry the warrants issued by the board pursuant to the budget for the fiscal year, whereupon the school board, by resolution adopted March 6, 1924, authorized the treasurer to sell and dispose to the highest bidder for not less than par value, $110,000 worth of these bonds held by the sinking fund investment.

Whereupon Mr. Manny, assistant cashier of the bank, communicated with bondsmen, of which plaintiff was one, talked to Mr. Roberts, and sold the bonds to him for his company, the plaintiff, at a price of 98½c on the dollar. He testified (C.-M. 99) that he got the bonds from the sinking fund investment box of school district No. 93, and delivered them to the American National Bank of Oklahoma City with instructions to turn them over to the plaintiff. The witness further testified that neither he nor his bank ever owned the bonds; that he was not treasurer nor assistant treasurer of the defendant school district, but that Nancy May Hunt was such treasurer (C.-M. 104):

that his act was just a labor of love to the treasurer (C.-M. 105).

Mr. Estill testified that after he got the school board to pass the resolution of March 6th, he sold the bonds to Mr. Roberts, of the plaintiff company, for 98½c on the dollar; that neither he nor his bank purchased or owned the bonds in question.

Mr. Hunter, member of defendant school board, testified that two or three days prior to March 15th, Mr. Roberts, of plaintiff company, called him by telephone from Oklahoma City and stated the bond proceedings were not satisfactory, and that he was preparing a resolution to correct the proceedings; that a resolution was delivered to him by Mr. Roberts, and on March 15th, he took the same to the individual members of the school board, who signed it, and while there was no meeting of the school board of that date, the resolution purporting to be of March 15th was spread in purported minutes of the school board as of that date. and as previous minutes the same was approved on May 5th thereafter.

These documentary minutes appear as follows:

"March 15th, 1924.

"The board of education of the city of Shawnee of the state of Oklahoma. met at the superintendent's office at the call of the president, on the 15th day of March, 1924, with the following members present: G. L. Baxter, J. B. Crabb, J. C. Baker, J. S. McIntyre. E. F. Campbell, J. F. Harris, absent. E. J. Strawn, Mr. Campbell offered the following resolution and moved its adoption: (A resolution authorizing the treasurer of said board of education to sell and deliver to the National Bank of Commerce of Shawnee, at par and accrued interest, all of the described bonds held by said treasurer as an investment for sinking fund).

"All present voting aye, whereon the president declared the resolution adopted, whereupon Crabb moved and Harris seconded it, that the board adjourn and the motion carried.

"Approved May 5th, 1924."

Upon the conclusion of the testimony the trial court sustained a demurrer to the evidence of defendant and rendered judgment for plaintiff and against defendant for the amount of judgment sought and represented by the coupons declared upon. From this final judgment, the defendant school board appeals.

Appellee says in its brief:

"There was no conflict in the testimony and no controversy as to the facts."

When objection of plaintiff was sustained by the trial court, the defendant school board offered to prove by witness Estill that when he appeared before the school board in urging the resolution of March 6th, and represented to the school board that they were without funds to run the school and pay the expenses the balance of the fiscal year, such as salaries and other current expenses, that there was on deposit in Mr. Estill's bank about $18,000 to the credit of the school district for that purpose. The court refused the offered testimony. Was the refusal of this testimony error? It went to the good faith of the intermediary, the banker; the resolution so passed became a part of the proceedings upon which plaintiff relied. The evidence offered should have been admitted, but it is immaterial for the determination of this case. The resolution of March 6th, itself, shows upon its face that the purpose for the sale of the securities was probably not in fact to the best interest of the school district. However, the reason set out was accepted by the school board and "deemed by them to be to the best interest." (Section 8573 ,C. O. S. 1921). The text of the resolution is:

"Whereas, the treasurer does not have sufficient cash on hand with which to carry the warrants issued by the board pursuant to the budget for said year: and

"Whereas, the time for the payment thereof has been extended from time to time, and because of said fact there appears to be insufficient funds to carry said warrants; and

"Whereas, said board has certain bonds in its sinking fund at this time which may be disposed of. * * *

"That the treasurer of said board be, and she is hereby authorized and directed to sell and dispose of, to the highest bidder, $110,000 worth of bonds now in the sinking fund of said board. * * *"

Here the very text of the resolution shows that the board of education was attempting to sell bonds and convert a sinking fund into cash to pay current indebtedness, or at least to carry warrants, payment of which had been extended from time to time.

The fact, if it was a fact, that there was no money in the treasury to pay outstanding warrants was neither alarming nor an emergency that would hamper the running of the school, for the whole theory of finance as contemplated by chapter 78, art. 2, C. O. S. 1921, is that warrants may be issued for current expenses whether the money to pay same is actually in the hands of the treasurer or merely in the process of

collection. Under sections 8628 and 8630, C. O. S. 1921, when the fund for payment of such warrants is not on hand, the warrants are so marked and draw interest at six per cent, per annum until the time specified when the money is collected and advertised to be on hand; thereafter payment of interest stops.

If Estill deceived the board by representing there were no funds on hand to pay the warrants, when in fact there were, such evidence would tend to establish the mala fides of the whole transaction. If the warrants by the resolution sought to be carried were drawn against an estimate made and approved, in due time the money to pay same would have been available; if the warrants were not so drawn, they were void and no investment could be made in them under the restriction contained in section 8580, supra.

It would seem foolhardy to dispose of bonds issued for a term of years and bearing interest to invest the sinking fund money in warrants upon which interest would necessarily stop when the process of collection of current funds was completed. On the other hand, if the sinking fund money was to be used to pay warrants which had not been regularly issued against a specific appropriation, the whole act and every step therein would be illegal and unlawful.

The evidence offered was merely cumulative.

By the resolution of March 6th, and the purported resolution of March 15th, which latter instrument was subsequent to the sale and delivery of the bonds in question, the treasurer was authorized to act upon conditions therein enumerated. There is no evidence that the treasurer ever acted. That fact is decisive of the issue here presented.

There is evidence that unauthorized persons did act. At least there was evidence of sufficient character to remove plaintiff from the position of a deemed prima facie holder in due course by reason of plaintiff's possession, for it was established that the one from whom plaintiff claimed title, to wit, the bank, never had or claimed any title at any time. Thereupon the burden was shifted upon plaintiff. To sustain that burden plaintiff was bound to prove, amongst other things, that it acquired title in good faith, that upon acquisition plaintiff had no knowledge of infirmity or defect in title. Lambert v. Smith, 53 Okla. 606, 157 Pac. 909; Childs v. Cook, 68 Okla. 240, 174 Pac. 274; Midland Valley Ry. Co. v. Goble, 77 Okla. 206, 186 Pac. 723; 8 C. J. 1063. This principle is enunciated in American National Bank v. Kerley (Ore.) 220 Pac. 116, 32 A. L. R. 262:

"Under a statute providing that every holder of a promissory note is deemed prima facie to be a holder in due course, but, when a defect in the title is shown, the burden is on the holder to prove that he, or someone under whom he claims, was a holder in due course, when evidence is offered showing that the note originated in fraud, it devolves upon the holder to go forward with evidence and show by a preponderance of evidence that he took the note under circumstances making him a holder in due course." (Syllabus, par. 13, in 32 A. L. R.) Gourley v. Pioneer Loan Co, 51 Okla. 534, 151 Pac. 1072; Hackley v. Tradesmen's Natl. Bank, 101 Okla. 91, 223 Pac. 163; Stevens v. Barnes (N. D.) 175 N. W. 709.

In 1 A. L. R. 718, note, the rule is stated thus:

"So, where bonds, after having been issued as a legal obligation, are surrendered by the holder and retired by the obligor, although not destroyed, and they are subsequently stolen and placed in circulation by the thief, a bona fide purchaser for value acquires no title thereto. Branch v. Sinking Fund Comm., 80 Va. 427, 56 Am. Rep. 596; Dist. of Col. v. Cornell, 130 U. S. 655, 32 L. Ed. 1041, 9 Sup. Ct. Rep. 694."

Mr. Manny, assistant cashier of the National Bank of Commerce, testified that the bonds in question were never the assets or property of the National Bank of Commerce. He further testified that he was with Mr. Estill at the time the bonds were delivered to the American National Bank of Oklahoma City, to be delivered to the American National Company. "Q. Where did you get the bonds? A. From the sinking fund investment box of school district No. 93." These bonds not being assets or property of the bank or banker, we must conclude that they were in the box belonging to the school district left at the bank for safekeeping. Then these bonds were in legal effect stolen from the box of the defendant school district, for the banker testifies he took the bonds from such box. They were neither his nor his bank's; he had no legal right to custody; he appropriated the personal property belonging to the school district. There was no consent on the part of the school treasurer shown to such appropriation, nor was there consent on the part of the school district shown to such an appropriation. As applied to dealings with public officers, charged with such trust, authority and consent are necessarily negatived when not af-

firmatively established. Every element of larceny was established.

"Whoever deals with a municipality does so with notice of the limitation on its or its agent's powers. All are presumed to know the law, and those who contract with it, or furnish it supplies, do so with reference to the law; and if they go beyond the limitations imposed, they do so at their peril." O'Neil Engineering Co. v. Town of Ryan, 32 Okla. 738. 124 Pac. 19; Hyde v. City of Altus, 92 Okla. 170, 218 Pac. 1081; McClure v. Township of Oxford, 94 U. S. 429; Town of New Butler v. Tucker, 54 Okla. 182, 153 Pac. 628.

C. C. Roberts, vice president of the plaintiff institution, testified:

"Q. You knew these bonds had been held by Shawnee sinking fund prior to the time you purchased them? A. Yes, sir. Q. Knew they were at the time you purchased them? A. Yes, sir; I knew that, yes, sir."

The plaintiff knew the bonds were indorsed as before stated when it purchased them. Yet plaintiff did not ascertain that the intermediary held lawful title to the bonds.

There was no valid delivery of these bonds or interest coupons.

Joyce on Defenses to Commercial Paper, vol. 1, sec. 79:

"As a general rule, a negotiable promissory note has no legal inception or valid existence as such, until it has been delivered in accordance with the purpose and intent of the parties. * * *"

Porter v. Andruss, 10 N. Dak. 558, 88 N. W. 567, states the rule:

"Such an unauthorized delivery to the payee and its subsequent transfer to the plaintiffs, the present holders, does not make the note subject to defenses by the makers, providing the plaintiffs are holders of the note in due course, without notice, and for value. It simply compels the plaintiffs to show that they are such holders. The possession of the note alone duly indorsed to them is not sufficient to protect them as against the showing of an unauthorized and fraudulent delivery and putting into circulation. Such a showing shifts the burden upon them to show that they are bona fide holders. * * *"

Assuming that the resolution prepared by Mr. Roberts and purporting to have been passed by the defendant school board on March 15th, was a contract of sale, the same was not in existence when the attempted unauthorized delivery of these bonds was made to plaintiff.

The plaintiff pleads that it never had any contract agreement or understanding with defendant, yet plaintiff's testimony is that it knew these bonds and coupons belonged to the sinking fund of the defendant when it attempted to purchase them, and, in addition, it deposited money in the Oklahoma City bank to the credit of the Shawnee bank for the benefit of defendant school district without agreement or authorization to make payment in that manner or to that depository.

There being no contract of sale and no authorized valid delivery, the plaintiff was not a holder in due course.

The appellant contends that the bonds were issued by the school district, then bought in by it. with money out of its sinking fund, and that when the bonds became canceled, they ceased to be obligations of the district. We do not agree to this theory. Assuming that the bonds were regularly issued, the fact that the treasurer of the school district purchased them out of a sinking fund of a prior bond issue would prevent cancellation, ipso facto. The treasurer's duty is to invest such sinking funds as he has. The treasurer has no power to cancel any bonds.

Under section 8572, C. O. S. 1921, after providing for investment by the treasurer, it is provided: "Or the proper officers may buy and cancel the outstanding bonds," with restrictions as to the purchase price.

By section 10433, C. O. S. 1921, it is provided:

"Or the board may buy and cancel the bonds of the district."

There is no evidence that the board acted to either buy or to attempt cancellation. "Or," used in both statutes, is a co-ordinating particle that makes an alternative and vests the power of cancellation in the board. The treasurer's authority is to invest. The board's authority is to buy and cancel. However, should the treasurer invest the particular sinking fund in the bonds for which that sinking fund was created—whether or not the board acted—the bonds would be canceled by operation of law, for the bonds would then cease to be an outstanding obligation of the municipal subdivision. Coffin v. Indianapolis, 59 Fed. 221; Bank of N. Y. v. Grace (N. Y.) 7 N. E. 162; Branch v. Comm. (Va.) 66 Am. Rep. 596; Walker v. State (Bond Debt Cases) 12 S. C. 200; 2 Dillion on Municipal Corps., sec. 853.

But the investment of a prior sinking fund by a treasurer in a subsequent bond issue of the same municipal subdivision does not operate as a cancellation, but an invest-

ment. Elser v. Ft. Worth (Tex. Civ. App.) 27 S. W. 739; In re Indiana Trust Co. (Ind. App.) 135 N. E. 807.

The treasurer has no authority to sell, barter or otherwise dispose of investments made out of the sinking fund in his custody until authorized so to do. National Surety Co. v. State, 111 Okla. 180, 239 P. 257.

The only morally justifiable sale of any such bonds by a public agency is a public sale, an advertised sale, a competitive bidding sale, and such sale should be conducted by the chairman or president of such board of the treasurer under express authority of the proper officers at a public place. But of course, such requirements for sale of bonds by a municipal subdivision cannot be said to be mandatory unless and until the Legislature so provides.

Section 8573, C. O. S. 1921, restricts and forbids the sale of any securities held by investment of sinking fund to an amount not less than par and accrued interest. The net resulting sum to the treasury for such sale must be at least par and accrued interest.

The pretended title claimed by plaintiff is derived, if at all, from the defendant school district. The price alleged to have been paid by plaintiff was 98½c; delivery was made upon that price. The unauthorized agent is alleged to have made up the difference so as to bring par. Who knows but what the bonds were in fact worth more than par? Who can say the treasury of the school district received par for these bonds? The acts were illegal and noneffective, for, considering that the unauthorized agent, the banker, was clothed with authority to act for defendant, a contract such as plaintiff testified it had with him, to wit, to buy the bonds at 98½c on the dollar, would be void.

"No action either at law or in equity can be maintained on a contract that is forbidden by law." Bass v. Smith, 12 Okla. 485, 71 Pac. 628; A., T. & S. F. Ry. v. Holmes, 18 Okla. 92, 90 Pac. 22.

The fact that the pretended agent pretended to make up the difference does not breathe life and give validity to the void contract. Village of Ft. Edw. v. Fish, 33 N. Y. S. 784; City of Beggs v. Kelley, 110 Okla. 274, 238 Pac. 466; Town of Buffalo v. Walker, 126 Okla. 6, 257 Pac. 766; Davis v. San Antonio (Tex. Civ. App.) S. W. 1161; Bay City v. Lumberman's St. Bank (Mich.) 160 N. W. 425; 2 Dillon on Municipal Corps., p. 1400. sec. 895; Thomas v. Richmond, 12 Wall. (U. S.) 349, 20 L. Ed. 453, cited in 7 A. L. R. 392.

So then we hold the purported sale and delivery of the bonds and coupons to plaintiff was wholly void because the purported contract of sale between plaintiff and defendants (represented by an unauthorized intermediary) was based upon an illegal consideration of 98½c on the dollar and in direct violation of the plain and positive provision of the statute.

There is another reason why this purported sale is void, that is because no consideration was received by the defendant school district, either directly or as represented by its treasurer. The only evidence of consideration is that Mr. Estill, an officer of the National Bank of Commerce, received a credit slip from the American National Bank of Oklahoma City, and plaintiff telegraphed on March 10, 1924, to Estill that a deposit had been made in Oklahoma City to the credit of the Shawnee bank for the benefit of the defendant school district. This telegram was an admission on the part of plaintiff that it knew the bonds belonged to the school district after it had received delivery and plaintiff was attempting to pay the true owner, which attempt was not shown to have been effective. Mr. Estill made deposit to the credit of the treasurer of the defendant school district; thereafter the bank in Shawnee became insolvent.

"A deposit by a debtor in a bank to the account of his creditor of a sum of money due the latter will not constitute payment to the creditor, unless he consents to the deposit. When such a deposit is made without the creditor's consent, the bank is merely the agent of the debtor to pay the money to the creditor." Hill v. Arnold (Ga.) 42 S. E. 475; Clemons v. Livingston Fire Ins. Co., 12 N. Y. S. 433.

To constitute a valid consideration it was essential that payment be made and received by the treasurer of defendant school board, in the absence of an agreement to the contrary. 21 R. C. L. 357.

To hold otherwise is contrary, not only to the adjudicated cases, but is contrary to reason and justice. We know that the law requires a depository bond for all such treasurers. Payment made in the manner here indicated would make the treasurer liable on her official bond together with other liabilities. in case she was not informed as to the deposit and in case a depository bond was not secured by her. The treasurer was not shown to have received or directed the deposit made; therefore, no consideration passed to the defendant school board and the transaction was for that reason void. The burden was upon plaintiff in this case.

We may well consider the purported resolution of March 16th. The plaintiff prepared it. It was signed by the individual members of the defendant school board, not in regular session, but as individuals; the minutes of the school board to the contrary were impeached. The minutes were approved on May 5th.

Here is afforded a spectacle of public officers attempting to act upon more than a hundred thousand dollar transaction individually. The power to act is vested in the board. To act officially and with validity it is necessary that members of the board act as a board. The acts and declarations of individual members, independent and apart, will not create a contract enforceable against the district. School Dist. No. 39, of Pottawatomie County, v. Shelton, 26 Okla. 229, 109 Pac. 67. A regularly convened session is essential to the validity of the act of such a public body. The statute vests the power to act in a single board, not three persons. Aikman v. School Dist., 27 Kan. 129; Honaker v. Board (W. Va.) 24 S. E. 544; Elgin Butler B. & T. Co. v. Hillsboro (Tex. Civ. App.) 205 S. W. 942. The resolution of March 16th was void. It was approved as minutes of a previous meeting. Such approval was noneffective as a ratification of the void act. The approval was of a false record. The resolution could never be valid by any less formal action than should have been originally made. Caxton Co. v. School District (Wis.) 98 N. W. 231. There was no resolution of ratification. There was no compliance with the condition of the resolution even if it be valid, for the treasurer by it was authorized to act. Presuming that this officer did her duty, we must indulge the presumption that she never acted under a void resolution. Since the authorized agent did not act, by what reason, or logic, or law can we say that an adoption of this resolution (conceding its adoption) operated to ratify the act of a stranger, a person who was without public office or bond or obligation to the school district? We cannot. The text of the resolution authorized an act in futuro by a regularly constituted bonded officer, the school treasurer. By what mental gymnastics can we say that authorization of a sale in futuro by a particular person and in a specified manner ratified a void and unlawful act, already performed, in the past by an unauthorized person, when it is not shown that in the passing of the resolution the board, as such or as individuals, knew, contemplated, or considered the past illegal and unlawful acts. Again we say we cannot.

The plaintiff recites there is no dispute as to facts in this case, and it is presumed to have introduced all evidence at its command.

The legal effect is that judgment should have been rendered upon the undisputed facts for defendant, and the judgment is reversed and judgment ordered to be rendered for defendant.

BRANSON, C. J., MASON, V. C. J., and HARRISON and CLARK, JJ., concur.

LESTER and HUNT, JJ., concur in conclusion. PHELPS, J., dissents.

Note.—See under (1) 35 Cyc. p. 997. (2) 35 Cyc. p. 996. (3) 8 C. J. p. 983, §1291. (5) 43 C. J. p. 203, §199. (6) 8 C. J. p. 759, §1025; p. 984, §1291. (10) 35 Cyc. p. 993. (11) 13 C. J. p. 495, §440. (12) 30 Cyc. p. 1184. (14) 35 Cyc. p. 902 (15) 22 C. J. p. 133, §69. (16) 43 C. J. p. 531, §825. (17) 4 C. J. p. 1187, §3224. See under (3,6) anno. 18 A. L. R. 18; 34 A. L. R. 300; 3 R. C. L. p. 1042; 1 R. C. L. Supp. p. 956; 4 R. C. L. Supp. p. 233: 5 R. C. L. Supp. p. 516; 6 R. C. L. Supp. p. 216. (11) 6 R. C. L. p. 817; 2 R. C. L. Supp. p. 211; 4 R. C. L. Supp. 442; 6 R. C. L. Supp. p. 411. (12) 21 R. C. L. p. 36. (15) 10 R. C. L. 880; 2 R. C. L. Supp. 1098; 4 R. C. L. Supp. p. 676; 5 R. C. L. Supp. p. 569; 6 R. C. L. Supp. p. 626.